**In re PETTERS COMPANY, INC., et al, Debtors.**

(includes: Petters Group Worldwide, LLC; PC Funding, LLC; Thousand Lakes, LLC; SPF Funding, LLC; PL Ltd., Inc. Edge One LLC; MGC Finance, Inc.; PAC Funding, LLC; Palm Beach Finance Holdings, Inc.).

Nos. 08–45257, 08–45258(GFK), 08–45326(GFK), 08–45327(GFK), 08–45328(GFK), 08–45329(GFK), 08–45330(GFK), 08–45331(GFK), 08–45371(GFK), 08–45392(GFK).

United States Bankruptcy Court, D. Minnesota.

Aug. 31, 2009.

James A. Lodoen, Lindquist & Vennum P.L.L.P., Minneapolis, MN, for Debtors/Trustee Douglas A. Kelley.

George H. Singer, Terrence J. Fleming, Lindquist & Vennum, James A. Rubenstein, Sarah E. Doerr, Moss & Barnett, Minneapolis, MN, for Trustee Douglas A. Kelley.

Michael Fadlovich, Michael E. Ridgway, Robert Raschke, U.S. Trustee Office, Minneapolis, MN, for U.S. Trustee.

## MEMORANDUM TO ORDER OF AUGUST 4, 2009 [DKT. NO. 263]

GREGORY F. KISHEL, Bankruptcy Judge.

On August 4, 2009, the Court entered an order to grant a motion for relief from stay that had been made by Greenwich Insurance Company ("Greenwich") and XL Specialty Insurance Company ("XL Specialty"). The effect of the grant of relief was to allow those insurers to receive, process, and make payment on claims made by, or in the name of, Thomas J. Petters and Debtors Petters Company, Inc. and Petters Group Worldwide, Inc., under directors' and officers' liability insurance policies that the insurers had issued in 2008, up to an aggregate amount of $7,500,000.00. This memorandum sets forth the rationale for that structuring of relief.

### FINDINGS OF FACT

**Backdrop: Court Proceedings Involving Thomas J. Petters and His Associates and**

**Business Enterprises**

1. PCI and PGW are the Debtors in the two lead cases in this grouping. All of

the cases are presently pending under Chapter 11; they are being jointly administered.[1]

2. Before September, 2008, PCI and PGW were owned and controlled by one Thomas J. Petters ("Tom Petters"). Tom Petters used them as holding companies, through which he maintained a large number of other business entities. Through this structure, Tom Petters transacted various sorts of business, including the purchase of consumer goods in bulk and their resale to retailers.

3. On October 3, 2008, Tom Petters was arrested on federal charges of mail and wire fraud, money laundering, and conspiracy. Several other individuals associated with him and his business operations were also charged. Similar criminal charges were brought against PCI and PGW. The criminal cases were brought in the United States District Court for this District. Tom Petters was subsequently indicted. His criminal case is pending and is scheduled to go to trial in mid-October, 2009.

4. The gravamen of the criminal charges is that Tom Petters and the other defendants had fraudulently induced investment or lending to Petters's business entities, purportedly to facilitate the purchase and resale of bulk lots of electronic equipment or other consumer merchandise, by using falsified purchase orders. The federal prosecutors have stated that the losses to such "investors" may exceed three billion dollars. The criminal case against Tom Petters is factually-complicated and document-intense.

5. In connection with the criminal cases, and on motion of the United States of America, the District Court appointed Douglas A. Kelley, Esq., as Receiver for Tom Petters and several other individuals who had been criminally charged, plus PCI and PGW.

6. During October, 2008, Kelley, pursuant to a specific grant of authority from the District Court, filed voluntary petitions under Chapter 11 for PCI, PGW, and a number of other business entities related to them.

7. On February 26, 2009, this Court approved Kelley's appointment as Trustee for these cases, over the objection of certain creditors.[2]

### Insurance Policies at Issue

8. The subject matter of this motion is two policies of directors' and officers' ("D & O") liability insurance issued by the movants to two of the Debtors, as follows:

a. Greenwich issued a "Private Company Reimbursement Insurance Policy," No. ELU105480–08, to PGW, for a policy period from June 25, 2008 to June 25, 2009. The policy provides for a $10,000,000.00 maximum aggregate limit of liability for covered "Loss," inclusive of "Defense Expenses." It includes a "Management Liability Company Reimbursement Coverage Part" that affords coverage for claims first made during the policy period against PGW and/or its "Insured Persons" for "wrongful acts."

b. XL Specialty issued a "Private Company Insurance Policy," No. ELU105060, to PCI, for a policy period from June 1, 2008 to June 1, 2009. The policy provides for a maximum aggregate limitation of liability of $5,000,000.00 for covered "Loss," inclusive of "Defense Expenses," for all

---

1. All further references to "the Debtors" will signify PCI and PGW only, but in the collective.

2. The decision in which Kelley's appointment was approved has been published at 401 B.R. 391 (Bankr.D.Minn.2009). An appeal is pending.

Claims within the scope of its Management Liability Company Reimbursement Coverage Part, that are made against PCI and/or its "Insured Persons" during the policy period.[3]

9. The Greenwich and XL Specialty policies are subject to a Tie In Limits Endorsement that imposes "shared limits of liability" on these two policies, plus a third issued to Thomas Petters, Inc. Greenwich and XL Specialty take the position that these provisions capped the aggregate amount of its duty of payment under all three policies for all claims, including those under the Management Liability Company Reimbursement Coverage Parts, at $10,000,000.00. Based on this, they take the position that any payment by them for covered loss under any of the three policies reduces the Limit of Liability available under all of the policies for "Common Claims," as defined in the policies.

### Accrual of Claims Made Against Policies

10. In the wake of the arrest of Tom Petters and the disclosure of the Government's investigation, civil lawsuits—at least eight in number—were commenced against PCI, PGW, and various of their directors, officers, managers, and employees.

11. In defending the criminal charges against him, Tom Petters has incurred substantial attorney fees and costs. He, or Kelley as Receiver, has also incurred expenses in defending the civil lawsuits.

12. Attorney fees and costs have been incurred on the part of PCI and PGW, in responding to the criminal charges against them and in the civil lawsuits.

13. Between October 10, 2008 and December 5, 2008, PCI and PGW notified Greenwich and XL Specialty of the commencement of the receivership proceeding, the criminal charges against them and Tom Petters, and the civil lawsuits, and tendered those matters to them under the D & O policies.

14. On February 23, 2009, Greenwich and PCI were notified that directors, officers, managers, and employees of the various Petters entities had retained counsel and were incurring expenses in defending or otherwise having to respond in the civil and criminal court proceedings.

15. When the motion at bar was presented at hearing, Greenwich and XL Specialty stated through counsel that they were willing to receive and analyze claims under the D & O policies for the payment or reimbursement of defense costs attributable to PGW and Tom Petters and, where they deemed it appropriate, to pay those claims. They stated that all such action would be subject to a reservation of their rights on the issue of actual coverage, given the crime/fraud exclusions in the policies.

16. Since the inception of the receivership proceeding, Kelley, as Receiver, has applied to the District Court for authority to pay his fees as Receiver and those of his legal counsel. He has also applied to the District Court for authority to pay, from receivership funds, defense costs incurred by Tom Petters and other defendants, including PCI and PGW. On the two applications made before the motion at bar was submitted, the District Court (Montgomery, J.) allowed a total of $2,125,110.42 in such attorney fees and costs, and authorized the Receiver to pay them from funds that he had liquidated or recovered. In

---

**3.** All further uses of these capitalized terms will signify the definitions given to them in the particular policy.

conjunction, she specifically directed the Receiver to seek reimbursement for all such expenses from the D & O insurance maintained by PCI, PGW, or any other related entity.

17. Due to the insufficiency of liquid assets in the bankruptcy estates of PCI and PGW, and pursuant to the District Court's authorization and directive, Kelley has advanced funds for the payment of the defense expenses for PCI and PGW, from the assets he has administered as Receiver for Tom Petters and the other subjects of his receivership that are not in bankruptcy.

18. PCI, PGW, Tom Petters, and directors, officers, and other individuals within the definitions of the D & O policies continue to incur expenses in their defense of the legal proceedings related to the Petters business entities, or their participation in those proceedings.

### CONCLUSIONS OF LAW

■ 1. PCI's and PGW's ownership interests in the two D & O liability policies are property of their respective bankruptcy estates.

■ 2. The status as property of the bankruptcy estates of the funds to be paid on account of claims made under the D & O policies is determined by two factors: the identity of the claimant-recipient, and the status under which the claimant-recipient will assert a claim under the policies:

a. As to any director, officer, or other Insured Person, including Tom Petters, any funds to be advanced to them on account of claims made for a covered Loss personal to them, including their own Defense Expenses, is not property of the bankruptcy estates of PCI or PGW; and

b. As to PCI or PGW as claimants, any funds to be advanced to them on account of claims made for their own covered Losses, including their own Defense Expenses, and any funds to be advanced to them as reimbursement for any expenditure they make in indemnifying any of their own Insured Persons against any covered Loss, are and will be property of their respective bankruptcy estates, upon the fixing of their rights to actually receive such payment(s).

■ 3. Because of the limit on the insurers' aggregate obligation of payment under the policies, and because of any claimant's right to be paid on a claim as submitted, the fixing of PCI's and PGWs actual right to receive payment is contingent on the coverage under the policies not having been exhausted by previous payment on claims submitted by either Debtor or by any of their Insured Persons.

4. Thus, at any given moment, the status of the unexhausted coverage under the policies is indeterminate, as to whether the right to payment under that coverage is or may become property of the bankruptcy estates of PCI and PGW.

5. The parallel processes for allowance of compensation of professional persons in the District Court's receivership proceeding and in these cases enable the respective courts to make an initial review of claims for Defense Expenses. This will furnish a preliminary control over the nature and amounts of claims that may be paid via the coverage under the policies.

■ 6. To the extent that Tom Petters has a direct right to coverage under the policies and to payment on account of his own Loss (including his own Defense Expenses), the processing and payment of his claims are not restrained by 11 U.S.C. § 362(a).

■ 7. However, the automatic stay does and will prohibit Tom Petters or any

other Insured Person from taking any action in respect to the D & O policies that would affect the portion of remaining coverage that could be allocated to any contemporaneously-accrued right to payment held by PCI or PGW, that is traceable to their own Loss or their indemnification of an Insured Person.

■ 8. The value of the remaining coverage and rights to actual payment under the policies cannot be allocated with any accuracy or precision among Tom Petters, any other Insured Person, and the bankruptcy estates of PCI and PGW, until all claims under the policies that are accrued to a single specific date are presented and paid by the insurers.

9. The automatic stay does prohibit the payment of a claim by a party other than the Debtors, that would be made from that portion of the aggregate coverage that is attributable to accrued rights to payment in favor of the Debtors. The extent of the coverage value so protected cannot be determined at present.

10. To the greatest extent possible, a resolution of this motion should both protect the indeterminate value of the bankruptcy estates' interests in their rights to direct coverage and to reimbursement, and recognize that the automatic stay does not prohibit the disposition of the remaining value of the coverage. Given that, it is appropriate to allow the presentation, processing, and payment on all claims that may be made against the policies, but to impose a limit on the dollar-value that may be disbursed without another review by this Court.

11. Considering all of the competing interests in question, the preservation of $2,500,000.00 in coverage in an unpaid status would embody an appropriate balance between the two considerations just noted, at this time.

12. Therefore, Greenwich and XL Specialty received relief from the automatic stay, to the extent it otherwise lies to restrain them from disbursing up to $7,500,000.00 on claims made by PCI, PGW, and Tom Petters, or on account of claims that could be made by them in their own right, under the policies.

## DISCUSSION

■ It is long-established in this Circuit that the ownership interest of a corporation in a D & O liability insurance policy becomes property of the bankruptcy estate when the company files for relief under Chapter 11. *In re Titan Energy, Inc.*, 837 F.2d 325, 329 (8th Cir.1988). For reasons inherent in the nature of such insurance, the ownership interest itself is not readily conducive to monetization; hence, it is not likely to be administered in bankruptcy. The issue more likely to arise is whether the *proceeds* of such a policy, i.e., the funds to be paid on an accrued claim within the scope of the coverage, are property of the estate. To the extent that such proceeds are property of the estate, any action through which a party would "obtain possession of" them is restrained by the automatic stay in bankruptcy. 11 U.S.C. § 362(a)(3); *In re Metropolitan Mortg. & Sec. Co., Inc.*, 325 B.R. 851, 855 (Bankr. E.D.Wash.2005).

Several courts have examined the status of such proceeds in the bankruptcy process. Their analyses and outcomes vary, often depending on the nature and scope of the D & O insurance in question. The decisions have spanned two-plus decades. A half-dozen recent decisions have refined the analysis to some degree. Commenting on the earlier jurisprudence, one court observed that "the cases are controlled by the language and scope of the policy at issue[,] not by broad general statements." *In re Allied Digital Technologies Corp.*,

306 B.R. 505, 509 (Bankr.D.Del.2004). The decisions issued after *Allied Digital Technologies* can not be characterized as simply as that, however.

■ Two basic rules run across the decisions, and are properly applied to the simplest-case scenarios:

> When [a D & O] insurance policy provides coverage only to the debtor, courts will generally rule that proceeds are property of the estate.... On the other hand, when a policy provides coverage only to directors and officers, courts will generally rule that the proceeds are not property of the estate.

*In re World Health Alternatives, Inc.*, 369 B.R. 805, 810 (Bankr.D.Del.2007). *See also In re Arter & Hadden, L.L.P.*, 335 B.R. 666, 672 (Bankr.N.D.Ohio 2005).

The conundrum arises, and the reasoning gets more elastic, where a debtor-corporation and its individual directors and officers are all designated as insureds under a D & O policy. *In re SN Liquidation, Inc.*, 388 B.R. 579, 584 (Bankr. D.Del.2008). The case law recognizes that any individual insured has a contractually-distinct status that runs directly between itself and the insurer. This makes the right to receive payment on a covered claim the property of that insured itself. A web of legal duties and rights under non-bankruptcy law requires the insurer to honor its obligations to a particular insured; and, presumptively, the insurer's duty of immediate performance in relation to a claim by that insured is restrained only by policy terms that may prioritize or otherwise regulate competing claims to the same aggregate coverage, or, possibly, statute or other general law. If there is no such control, the payment on covered losses could be made on a "first-come, first-served" basis until the policy limit is reached. Unless policy or general law mandates a proration or other allocation of exhaustible coverage among competing claims, the earliest-accrued and first-submitted could get the jump in the actual realization of the value of coverage, to the detriment of others that have accrued claims within the scope of the coverage.[4]

To anyone who handles bankruptcy cases, this prioritization of right exclusively by time of assertion is somewhat dissonant; it cuts against the dictates of pro rata sharing and orderly administration that are embodied in the substantive law of bankruptcy. And, in any bankruptcy case where the debtor is the policyholder, but not the only insured, the first-come, first served approach can materially jeopardize the interests of the estate. When D & O insurance coverage is in force, the estate's realization on it can minimize administrative expenses otherwise chargeable against estate assets, channel the satisfaction of some creditors' claims to an alternate source of recourse, and retain maximum value of estate assets for distribution to other creditors.[5]

■ But how to do service to both, the nature of the underlying assets and the values that structure the bankruptcy process, as one should in this context?[6] To

---

4. The court in *In re Boston Reg'l Med. Ctr.*, 285 B.R. 87 (Bankr.D.Mass.2002) assumed entirely to the contrary. However, it did so without citations, and acknowledging that its conclusion of equal entitlements was based on an "admittedly preliminary reading of the law." 285 B.R. at 95 (parentheses omitted).

5. The Eighth Circuit recognized this in *In re Titan Energy, Inc.*, 837 F.2d at 329.

6. In a bankruptcy case, the federal courts are to apply the law of the forum state to identify the nature and extent of property rights implicated in disputes between the estate and other contenders; there is no separate substantive law of property rights applicable in bankrupt-

essay that, it is necessary to determine whether proceeds are property of the estate, no matter how undifferentiated they may be. Unless some form and classification is imposed on the undifferentiated rights of all insureds, there is no principled way to address the valid concerns raised by the Debtors' Committee of Unsecured Creditors, while still allowing Greenwich and XL Specialty to carry out their duty to their insureds as a group.[7]

In this regard, all of the published case law is unsatisfying; none of the decisions articulate a specific rationale, with a precision based on criteria for classification, to allocate the value of unexhausted D & O coverage between the estate (as successor to the debtor-insured) and other insureds eligible to draw on the coverage.

■ The central aspect of the conundrum is recognized in *In re Boston Reg'l Med. Ctr., Inc.*, 285 B.R. at 95: "When claims for coverage exceed the policy limit, payment of any one's claim in full necessarily reduces the value of the claims of the others (at least as a group) . . ." And in the case of so-called "wasting" or "burning candle" coverage like that at bar,[8] the *Metropolitan Mortg. & Sec.* court identified the problem squarely: "As the defense costs (of all insureds) exhaust the policy limits, the estate asset [is] depleted which increase[s] the debtor's exposure to third-party claims and decrease[s] realization of the debtor's claims against the proceeds." 325 B.R. at 856 (summarizing part of rationale from *In re Circle K Corp.*, 121 B.R. 257 (Bankr.D.Ariz.1990)). Put another way, ". . . satisfaction of the insurance companies' duty to pay claims brought against non-debtor co-insureds, including satisfaction of the defense costs being incurred by the co-insureds, will render it impossible to satisfy the claims . . . held by the debtors [with proceeds of the insurance]." *Id. See also In re Arter & Hadden, L.L.P.*, 335 B.R. at 672; *In re First Cent. Fin. Corp.*, 238 B.R. 9, 18 (Bankr. E.D.N.Y.1999).

■ The courts that have followed this chain of analysis then take a leap for the act of characterization: When, as a general matter, coverage is jointly subject to claims by a debtor-insured and by non-debtor insureds, the *entire* value of unexhausted coverage, and any cash proceeds to be disbursed on *any* claims against the coverage, are property of the bankruptcy estate of the debtor-policyholder. *In re Allied Digital Technologies Corp.*, 306 B.R. at 511 ("the general rule is that since

cy cases alone. *Nobelman v. American Sav. Bank*, 508 U.S. 324, 329, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993); *Barnhill v. Johnson*, 503 U.S. 393, 398, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992); *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). *See also In re Schauer*, 835 F.2d 1222, 1225 (8th Cir.1987) (as to property of debtor with attributes governed by contract or other source of law, bankruptcy estate succeeds to only those rights granted by nonbankruptcy law that governed pre-petition). Thus, the bankruptcy court has no option but to recognize the rights of other insureds whose footing is equal to the estate's.

7. Both the insurers and the Debtors' Trustee insisted that the Court need not reach this issue, while the Committee maintained that it had to, and that the big question was extremely easy to answer. None of these parties' counsel were correct.

8. Under such policies, which do not impose on the insurer a direct duty to defend,

. . . the directors and officers and other insured defendants are entitled to have their costs of defense paid by the insurance carriers from the policy limits[,] . . . meaning that as the litigation continues, the amount available to a successful plaintiff under the policy is being reduced by the costs of defense of the litigation.

*In re Metropolitan Mortg. & Sec. Co., Inc.*, 325 B.R. at 853.

the insurance proceeds *may* be payable to the debtor they are property of the debtor's estate ...") (emphasis added); *In re Sacred Heart Hosp. of Norristown,* 182 B.R. 413, 420 (Bankr.E.D.Pa.1995) (where "the Debtor is indeed an insured," jointly with officers and directors, it "has a sufficient interest in the proceeds *as a whole* to bring them into the estate ...") (emphasis added). To get to this conclusion, these courts usually extract one part of the prior case law's rationale for classifying rights of insurance coverage as property of the estate: insurance coverage can "protect[ ] the estate's other assets from diminution." Then they stretch that to a property attribute itself. *E.g., In re Allied Digital Technologies,* 306 B.R. at 512.[9] But the all-encompassing scope of the ensuing status does not recognize the central characteristic of *all* insureds' potential property rights in the value of the coverage: until any insured has presented a claim to the insurer, the value of its rights to payment as an insured are not yet fixed or liquidated, let alone realized; but nonetheless, upon the occurrence of any covered loss, any insured has a contingent and unliquidated right to a payment from the insurer. In the case of a debtor's co-insureds, that right is distinct from the debtor's right, and the automatic stay of 11 U.S.C. § 362(a) does not lie to prohibit the co-insured from exercising its right to present its claim and to receive payment on it.

But, where there is a universe of potential claimants, a bankruptcy estate among them, and insured losses via the accrual of defense expenses are an ongoing process in intense legal proceedings, all insureds' future rights to the value of the coverage are completely indeterminate. Further, no insured's rights to a current payment are determinate until a claim is presented against an unexhausted balance of coverage. When the availability of reimbursement or indemnification is subject to a first-come, first-served order of distribution, as apparently is the case here, the potential jeopardy to the bankruptcy estate's rights is obvious: it may have accrued but unpresented claims, or may accrue them shortly, in large amounts, against the unknown ripening of competitors' rights.

But on the other hand, there is no way that the possibility of a right to payment in the bankruptcy estate, via some claim in some amount, can make the full balance of coverage property of the estate.[10] There is nothing divine about the estate's status as an insured and prospective claimant; the universe of other claimants has the same status under non-bankruptcy law.[11]

---

9. This is a moderately-refined variant of a thought in an early decision, that a debtor-corporation's rights in D & O insurance coverage are property of the estate because the estate "is worth more with them than without them." *In re Minoco Group of Companies, Ltd.,* 799 F.2d 517, 519 (9th Cir.1986). *See also In re Titan Energy, Inc.,* 837 F.2d at 329.

10. There is a partial recognition of this in the pronouncement of several courts, that

> when the liability policy provides the debtor with indemnification coverage but indemnification either has not occurred, is hypothetical, or speculative, the proceeds are not property of the bankruptcy estate.

*In re Arter & Hadden, L.L.P.,* 335 B.R. at 672. *See also In re Adelphia Communications Corp.,* 298 B.R. 49, 53 (S.D.N.Y.2003). But these courts do not entirely recognize the dynamic of the accrual of competing claims against D & O coverage, which has special sensitivity in the case of wasting/burning-candle coverage under which defense costs are rolled in with indemnifiable losses for the purposes of policy limits.

11. This view seems not to have been shared by the *Allied Digital Technologies* court, at least as may be gleaned from its summary pronouncement:

> A debtor's interest in the proceeds requires protection from depletion and overrides the

So the most that can be said is that some portion of the rights to payment on the unexhausted coverage with Greenwich and XL Specialty is property of the bankruptcy estates of PCI and PGW, and some portion will likely continue to be, until the policy limits are reached in actual payout and the coverage is exhausted. The value of that property of the estate cannot be identified, at present or at least on the present record; but it is protected by the automatic stay, and properly so. The balance of the value of the unexhausted coverage is not so protected; it is available for the benefit of other insureds, and should be disbursed as appropriate pursuant to the insurers' duty.

■ Apart from the Court's more abstract, institutional obligation to promote the automatic stay, the current posture of potential claimants as competitors requires some sort of control to be imposed, to ensure that the unliquidated value of the estate's interest in the proceeds is preserved.[12] This will make it more likely that the estate gets something close to its due from the benefits of reimbursement and indemnification under the policy.

■ The matter at bar was a motion for relief from stay, in which the threshold issue was the identification of just what was protected by the stay in the first instance and what was not. Thus, the appropriate structure for the control was a grant of relief from the stay, to the extent of a certain value of the unexhausted coverage; this would remove the cloud of a potential violation of the stay from the payment of any and all claims as to that amount. To the extent that any component amount of the aggregate unexhausted coverage is traceable to claims that have been made or could now be made on behalf of PCI and PGW, the Trustee may assert claims against this freed-up amount. So may the Receiver.[13]

The policy limits will not be consumed by the amount of claims that can be identified from the District Court's fee allowances so far; in fact, the total, including allowances made by Judge Montgomery in orders entered on June 30, 2009, was significantly less than the policy limit that the insurers are asserting. Judge Montgomery's orders clearly contemplated that the receivership's accounts could be "recharged" by payments made on claims against D & O insurance, for amounts previously disbursed from the receivership

---

interest of the [co-insured] directors and officers.

306 B.R. at 511. But this conclusion seems to be based on a logical tautology.

12. In the case of a viable, ongoing business outside of bankruptcy but under the threat of a lawsuit covered by a D & O policy, there would be much more of a concurrence of interests in the defense effort, among actual or potential parties-defendant including the corporate policyholder. The motivation to maintain a united front in a coordinated defense is essentially gone, where a defunct business is under accusations of massive fraud, and the allocation of responsibility for the downfall (plus the blame for any fraud) is contested among parties who are no longer associates and colleagues in a common enterprise. In that situation, the disposition of rights to coverage is no longer subject to a single, managed defense effort. And, it is more likely that there will be larger claims against the coverage, heightened competition among claimants, and quicker exhaustion of policy limits.

13. In the text of their motion, the insurers sought leave to process and pay claims for "Defense Expenses incurred by PGW and [Tom] Petters," and those possible claimants alone. In the interests of giving the Trustee and Receiver the maximum latitude to recover in consequence of past payments the Receiver had made in indemnification and reimbursement of other individual insureds, the grant of relief under the order named PCI as well.

on the fee allowances. To allow that recharging for past disbursements, to give some latitude for future refreshers, and to protect some recourse for the bankruptcy estates for the future emergence of their own covered losses, it was most appropriate to set up something in the nature of an allocated reserve out of the full coverage, which would continue to be protected by the automatic stay.

The record did not furnish a basis to quantify the amount of such a protection, with pinpoint accuracy. The greatest potential call on the unexhausted coverage is obviously on the account of Tom Petters, personally, as an Insured Person. At this point, no one can gainsay the right of the receivership to make that call, on an ongoing basis, when the need to fund a criminal defense is the greatest and when the District Court has recognized that through the allowance and authorization for payment of substantial attorney fees from receivership funds.[14] As to PCI's and PGW's claims against the D & O coverage, in their own right as insureds or as indemnitors, the record did not and does not enable any quantification at all; but they should be fully enabled to make such claims now.

And as to structure, it was appropriate to just free a specific amount of the coverage, and a substantial one, from any cloud created by the actual or potential vitality of the automatic stay. Some courts have conditioned such relief on preliminary application, by the insureds or the insurers, to the bankruptcy court, for review there. *E.g., In re Arter & Hadden, L.L.P.,* 335 B.R. at 674. However, that measure is unwarranted in these cases; it would impose a third, wholly superfluous segment into the process, when the District Court's

procedures for review and authorization of claims against the receivership account, and the insurers' own review of allowability under their policies' terms, already exact plenty of accountability from claimants. Rather, it was best to set a cap in a sufficiently substantial amount, and just let the submission and processing of claims go ahead until that level was reached.[15]

On all considerations, the appropriate amount to be set aside at present was twenty-five percent (25%) of the aggregate coverage. Freeing up $7,500,000.00 will enable the submission and payment of the claims subsumed in Judge Montgomery's three fee allowances for Tom Petters's counsel through the receivership proceedings, for Defense Expenses incurred by PCI and PGW to date, and something more. When that amount of coverage is exhausted, Greenwich and XL Specialty may renew their motion. By then, the criminal cases will have progressed enough, and the implications for PCI and PGW of the accrual of their own defense expenses and liabilities for indemnification will have further clarified, so that an allocation of the balance of coverage may be made between the bankruptcy estates and the other Insured Parties with better focus.

---

**14.** At present, the trial in the criminal case against Tom Petters is scheduled to commence on October 26, 2009.

**15.** The court in *In re Boston Reg'l Med. Ctr., Inc.* did this. 285 B.R. at 98.