# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

Nos. 09-6030 thru 09-6052

_____

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| SportStuff, Inc., | * | |
| | * | |
| Debtor. | * | |
| | | |
| Overton's, Inc., | * | |
| Bart's Water Ski Center, Inc., | * | |
| d/b/a Bart's Water Sports, | * | |
| The Wind Surf Co., | * | |
| d/b/a TWC Surf and Sport, | * | |
| Wal-Mart Stores, Inc., | * | |
| Land 'N' Sea Distributing; | * | |
| Land 'N' Sea Midwest, | * | |
| Ace American Insurance Company; | * | |
| Bruce Bosley, d/b/a Century Marine; | * | |
| Tige Performance Boats, LLC; | * | |
| Cramar, Inc., d/b/a Duchow's | * | |
| Boat Center, | * | |
| | * | |
| Appellants | * | |
| | * | Appeals from the United States |
| vs. | * | Bankruptcy Court for the |
| | * | District of Nebraska |
| Interstate Fire & Casualty Insurance | * | |
| Company; SportsStuff, Inc., Debtor, | * | |
| Unsecured Creditors Committee | * | |
| Evanston Insurance Company; | * | |
| Axis Surplus Insurance Company; | * | |
| | * | |
| Appellees | * | |

_____

Submitted: April 15, 2010
Filed: June 3, 2010
_____

Before SCHERMER, FEDERMAN, and VENTERS, Bankruptcy Judges.
_____

VENTERS, Bankruptcy Judge.

These appeals seek review of the bankruptcy court's memorandum and four orders approving settlements between the Debtor and three of its insurers, Axis Surplus Insurance Company, Evanston Insurance Company and Interstate Fire & Casualty Company and enjoining further actions against the insurers.[1] For the reasons stated below, we reverse the rulings of the bankruptcy court.

## I.  STANDARD OF REVIEW

A bankruptcy court's approval of a settlement is reviewed for an abuse of discretion.[2]  An abuse of discretion occurs if the court bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.[3]  The general standard for evaluating a settlement is whether the settlement is "fair and equitable

---

[1] The multiplicity of case numbers in the caption (09-6030 to 09-6052) is the result of separate appeals filed by different parties seeking review of one or more of the bankruptcy court's orders approving the settlements discussed *infra*.  Those appeals have been consolidated for purposes of this decision.  Separate judgments will be entered in each appeal.

[2] *In re Martin*, 212 B.R. 316, 319 (B.A.P. 8th Cir. 1997).

[3] *In re Racing Servs.*, 332 B.R. 581, 584 (B.A.P. 8th Cir. 2005) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990)).

and in the best interests of the estate."[4]  If a settlement provides for an injunction, as the settlements in this case do, the injunction must not exceed the authority or jurisdiction of the approving court.[5]

## II.  BACKGROUND

The Debtor, SportsStuff, Inc., is a privately owned Nebraska corporation that specialized in designing, patenting, and selling a wide range of inflatable water and winter sports and leisure products.  SportsStuff filed for protection under Chapter 11 of the Bankruptcy Code on December 31, 2007, after an onslaught of personal injury, wrongful death, and property damage claims stemming from its sale of the "Wego Kite Tube," an inflatable watercraft designed to be towed behind a power boat.  With the exception of Appellant Ace American Insurance Company,[6] the Appellants in this appeal were all resellers of the Wego Kite Tube prior to its recall in 2006.  Because they were in the chain of distribution, the Appellants have all been sued or threatened with suit for personal injuries allegedly caused by the Wego Kite Tube.  At the time of the filing of its bankruptcy petition, SportsStuff and its insurers had expended approximately $4,390,033.80 to settle thirteen lawsuits and claims and another 67 lawsuits were pending.

---

[4] *Martin*, 212 B.R. at 319.

[5] *See, e.g., Matter of Zale Corp.*, 62 F.3d 746, 755 (5th Cir. 1995) ("[A] bankruptcy court may potentially include an injunction as part of a settlement only once jurisdiction is established.").

[6] Ace insures Appellants Bruce Bosley d/b/a Century Marine and Cramar, Inc. d/b/a Duchow's Boat Center, and has been named as a defendant in Wego Kite Tube-related litigation currently pending in Wisconsin.

## A.      SportsStuff's Insurance Policies

SportsStuff had various insurance policies in place for the relevant time period (2006 - 2007), including general liability, foreign liability, products liability, and excess insurance policies. Of those policies, three covered claims related to the Wego Kite Tube.

### 1.      The Evanston Policy

In 2006, SportsStuff obtained a products liability insurance policy from Evanston Insurance Company ("Evanston"). The Evanston policy is a primary insurance policy with limits of $1 million per occurrence and $3 million in the aggregate, covering claims made between January 1, 2006 and January 1, 2007.[7]

The Evanston Policy includes standard indemnification coverage, requiring Evanston to "pay on behalf of the Insured all sums in excess of the deductible . . . which the Insured shall become legally obligated to pay as damages as a result of ..." covered claims, up to the policy's liability limits. Evanston is also obligated to "defend any claim or suit against the Insured seeking damages to which this insurance applies even if any of the allegations of the suit are groundless, false or fraudulent."

The Evanston Policy further states that it "shall pay *in addition to the applicable limits of liability*,[8] all claim expenses," which include expenses incurred by an insured in the defense of a claim. Thus, the payment of defense expenses does not operate to reduce the Evanston Policy's overall limits of liability. This kind of policy is known as a "non-eroding" policy. However, all of Evanston's

---

[7] The term "primary" in this context is distinguished from "excess" or "secondary" coverage which is payable only after primary coverage has been exhausted.

[8] Emphasis added.

4

indemnification and defense obligations terminate when the policy limits have been exhausted by judgment or settlement.

In addition to Evanston's obligations to SportsStuff, the Evanston Policy includes an "Additional Insured – Vendors (Broad Form)" endorsement that "amends" the policy to include as an "Insured" any vendor selling SportsStuff's products in the regular course of the vendor's business. The following Appellants qualify as "Insureds" under the Evanston policy: Bart's Water Ski Center, Inc. d/b/a Bart's Water Sports, Century, Cramar, Land 'N' Sea Distributing, Inc., Land 'N' Sea Midwest, Inc., Overton's, Inc., The Wind Surf Co. d/b/a TWC Surf and Sport, and Wal-Mart Stores, Inc.

### 2.    The Axis Policy

The policy issued by Axis Surplus Insurance Company ("Axis") covers the same period, January 1, 2006 to January 1, 2007, with limits of $5 million for each occurrence and in the aggregate. The proceeds of the Axis Policy, however, are only available if SportsStuff becomes legally obligated to pay damages due to injury or damage claims in excess of the per occurrence or aggregate policy limits under the Evanston Policy; thus, it is an excess or surplus insurance policy.

The Axis Policy follows the terms of the Evanston Policy with regard to coverage of "additional insureds." Thus, the Appellants who qualify as "Insureds" under the Evanston Policy likewise qualify as insureds under the Axis Policy.

Regarding defense obligations, the Axis Policy provides for defense expenses if "all underlying insurance" has been exhausted by payment of damages. As with the Evanston Policy, cost of defense reimbursements do not reduce the Axis Policy's overall limits of liability, and Axis's defense obligations end when Axis has "exhausted the limits of liability" under the policy.

### 3.    The Interstate Fire and Casualty Company  Policy

SportsStuff also holds a primary liability policy from Interstate Fire and Casualty Company ("IFCC"). The IFCC Policy has limits of $1 million per occurrence and a $2 million aggregate limit covering claims asserted from December 31, 2006 to January 1, 2008.  The IFCC Policy has a $100,000 per claim deductible with a $1,000,000 aggregate deductible limit.  In contrast to the Axis and Evanston Policies, any funds spent on defense costs decrease the proceeds available for the payment of claims.  This kind of policy is known as a "burning-limits" policy.

The IFCC Policy's "additional insured" provision is narrower than those in the Evanston and Axis Policies, covering only those parties that have entered into a written contract or agreement with the Debtor indicating that such party is an additional insured under the IFCC Policy.  Appellants Overton's, Inc. and Wal-Mart Stores, Inc. qualify as additional insureds under the IFCC policy because each had such an agreement with SportsStuff.[9]

### 4.    Status of Claims against the Debtor

As of the petition date, there were 67 active lawsuits pending against the Debtor, alleging personal injury, property damage, or wrongful death arising from the use of the Debtor's products.  Evanston, Axis, and the vendors of the Debtor's products were named as defendants in some of these lawsuits.  Evanston and the Debtor apparently settled nine of these lawsuits post-petition, with Axis participating in one of the settlements.  There were also 72 known unresolved claims for personal injury or property damage arising from the use of the Debtor's products that have not yet resulted in litigation.  The Debtor and Evanston have settled four of these claims.

_____

[9] Appellant Land 'N' Sea maintains that it is also an additional insured under the IFCC policy, although Land 'N' Sea has not identified a separate written agreement with SportsStuff.  IFCC denies that Land 'N' Sea qualifies as an additional insured under its policy.  The bankruptcy court did not rule on this issue.

Approximately $6,370,000 remains available under these primary and excess products liability insurance policies.

**B.     The Adversary Proceeding**

On January 31, 2008, SportsStuff filed an adversary complaint seeking injunctive and declaratory relief to stay the numerous lawsuits and claims made against SportsStuff, its insurers, co-insureds, and indemnitees. Specifically, SportsStuff sought: (1) a declaration that any proceeds payable by Evanston, Axis, and IFCC (the "Insurers") should be considered property of SportsStuff's bankruptcy estate; (2) a declaration that the automatic stay in Section 362(a) of the Bankruptcy Code prohibited further litigation against the Insurers, SportsStuff, SportsStuff's co-insureds and indemnitees, and any property of the bankruptcy estate; and (3) a preliminary injunction enjoining the continuation or commencement of litigation against the same. The Unsecured Creditors Committee and the Insurers intervened in the lawsuit, with the Insurers filing complaints in intervention naming vendors of the Debtor's products as defendants.

By agreement of the parties, on April 28, 2008, the bankruptcy court entered a preliminary injunction enjoining the continuation or commencement of litigation by the tort claimants against the Debtor, the Vendors and the Insurers.

Sometime thereafter, SportsStuff announced that it had reached a settlement with each of the Insurers (collectively, "Settlements"), and in February and March 2009, SportsStuff sought court approval of the Settlements. In general, the Settlements provided that the Insurers would each remit to the estate the remainder of their insurance policy limits in exchange for an injunction (the "Settlement Injunction") barring any party, including the Debtor, personal injury claimants, and Vendors, from pursuing the Insurers for any claim related to SportsStuff's Policies. In essence, the Settlements discharged the Insurers from any further responsibilities or liability under the Policies, including the duties to defend and indemnify other parties named as

7

additional insureds under the Insurers' policies. The Settlements further mandated that the substance of the Settlements would be embodied in and become part of any plan of reorganization that the Debtor should file. None of the Appellants was a party to the Settlements.

The Appellant-Vendors ("Vendors") objected to the Settlements on grounds that, *inter alia*, they would abrogate the Insurers' separate contractual duties to defend and indemnify the Vendors as additional insureds under the Policies, deprive them of their state-law right to challenge the Insurers' conduct in entering into the settlement as a breach of the Insurers' purported duty of good faith and fair dealing, and improperly mandate a plan of reorganization without the necessary procedural steps required for plan confirmation.

The bankruptcy court heard the motions to approve each of the Settlements and the respective objections, and on May 28, 2009, the bankruptcy court entered a non-final order and memorandum opinion indicating its intention to overrule the objections and grant the motions to approve each of the Settlements, subject to the submission of a proposed order by SportsStuff after input by some of the claimants.

On July 23, 2009, proposed orders were filed and circulated, and on August 11, 2009, the bankruptcy court entered three separate orders in the main bankruptcy case approving the settlements with each of the three Insurers, as well as a duplicate order approving the settlement with Axis in the Adversary Proceeding (collectively, "Settlement Orders").

## C.    The Settlement Orders

### 1.    Evanston and Axis Settlement Orders

The Evanston and Axis Settlement Orders provide that, upon payment of the settlement amounts: (i) [the Insurers] shall have no further duties or obligations based

upon, arising out of, or related to the [Policies]; (ii) [the Insurers] shall be released from any claims under the [Policies] including but not limited to claims by SportsStuff and any other insured; (iii) the [Policies] shall be fully and unequivocally exhausted; (iv) [the Insurers] shall have no obligation to pay any defense expense or participate in any claim, suit or proceeding involving SportsStuff, its vendors, or any other insured; and (v) the [Policies] shall be of no further force or effect. The Axis and Evanston Settlement Orders expressly reserve the settlement proceeds for the personal injury claimants and prohibit their use for administrative expenses.[10]

The Evanston and Axis Settlement Orders also provide that "[a]ny plan of reorganization proposed by the Debtor or any interested party shall incorporate the provisions of Settlement Agreement and this Order without variation, and must contain terms not inconsistent with the terms of the Settlement Agreement."

### 2.    IFCC Settlement Order

The IFCC Settlement Order similarly provides that, upon payment of the policy proceeds: (i) IFCC shall have no further duties or obligations based upon, arising out of, or related to the Policy including, without limitation, that IFCC shall be released from any obligation to defend or indemnify the Debtor or any vendors, indemnitees or additional insureds that may be covered by the Additional Insured endorsement found in the Policy; (ii) IFCC shall be released from any claims under the Policy; and (iii) the Policy shall be exhausted and shall be of no further force or effect. The IFCC Settlement Order is silent as to whether the settlement proceeds are reserved to the personal injury claimants, stating only that they are to be reserved for "claims," but

---

[10] Axis also maintains that the Settlement Order does not prohibit the Vendors from making claims against the settlement proceeds, citing the settlement agreement attached to its motion to approve the settlement. Although that settlement does appear to permit vendor claims against the proceeds, the memorandum approving the Settlements specifically reserves the proceeds for the personal injury claimants.

it does prohibit use of the settlement proceeds for the payment of administrative or other expenses.

Timely appeal was taken from each of the Settlement Orders.

**D.     Supplemented Record**

On April 22, 2010, we granted Appellant Overton's motion to supplement the record to include reference to the bankruptcy court's March 30, 2010, order approving the Debtor's sale of "substantially all Debtor's assets" to a third party (Kwik Tec, Inc.).

## III.  DISCUSSION

As noted above, the standard for approval of a settlement under Fed. R. Bankr. P. 9019 is that the settlement be fair and equitable and in the best interests of the estate.[11]  And to the extent a settlement requires a court to take an affirmative act, such as the Settlement Injunction, that act must be within the approving court's jurisdiction and authority.

The bankruptcy court found that the Settlements met all of these requirements, although it made specific findings only with regard to the benefit of the estate and the court's authority to impose the Settlement Injunction.

The bankruptcy court found that it had the jurisdiction and authority to approve the Settlements and to impose the Settlement Injunction based on the holding in *MacArthur v. Johns-Manville*.[12]  In *Johns-Manville*, the Second Circuit Court of

---

[11] *Martin*, 212 B.R. at 319.

[12] 837 F.2d 89 (2nd Cir. 1988). We note that *Johns-Manville* was cited with approval by the Eighth Circuit Court of Appeals in *National Union Fire Insurance Co. of Pittsburgh, PA v. Titan Energy, Inc.*, (*In re Titan Energy*), 837 F.2d 325,

10

Appeals upheld a bankruptcy court's imposition of a similar (but distinguishable, as discussed below) injunction barring vendors of the debtor's products (asbestos) from making claims or suing the debtor's insurers, notwithstanding the vendors' status as additional insureds under the debtor's insurance policies. As cited by the bankruptcy court, the *Johns-Manville* court held: 1) any rights the vendors had in the debtor's products liability policy were "derivative and inseparable" from the debtor's own rights, so as to fall within the bankruptcy court's jurisdiction over property of the estate; 2) the bankruptcy court had the authority to impose the injunction as a corollary to its powers under 11 U.S.C. § 363(f) to dispose of assets free and clear of liens, channeling the vendors' claims to the insurance (settlement) proceeds; and 3) the bankruptcy court had the equitable power to impose an injunction because it was essential to a workable reorganization.

We reverse the bankruptcy court's decisions approving the Settlements in this case for four reasons. First, the Settlements do not preserve to the Vendors the rights they would have either under the Bankruptcy Code or under state law outside of bankruptcy, and are therefore not fair and equitable. Second, the Settlement Injunction differs significantly from the injunction approved in *Johns-Manville*. Third, the record does not support a finding that the Settlements are in the best interest of the estate. And finally, the procedure by which the Settlement Injunction was approved was improper.

## A.    The Vendors' Rights under the Policies

*Johns-Manville*, and by reliance, the bankruptcy court, held that the bankruptcy court had jurisdiction over an "insured vendor's" rights in the debtor's insurance policies because those rights are "completely derivative"[13] of the debtor's rights as the

---

330-1(8th Cir. 1988), although not for the proposition that a co-insured's rights are entirely derivative of an insured debtor.

    [13] *Johns-Manville*, 837 F.3d at 92.

11

named insured. Although we cannot examine the insurance policy at issue in the *Johns-Manville* case, we can examine the Policies in this case, and under the terms of the Policies, not all of the Vendors' rights are "completely," or even partially, derivative of the Debtor's rights under the Policies.

Under the insurance contracts at issue here, as of the commencement of the case, the Vendors had the independent right to be indemnified and defended by the Insurers.[14] The Policies at issue do not distinguish between the named insured's or additional insured's rights to make claims under the policies. Under the Evanston Policy, and by implication the Axis Policy, the additional insured endorsement actually "amends" the policy to include as an "Insured" any vendor selling SportsStuff's products in the regular course of the vendor's business. Under the IFCC Policy, Appellants Overton's and Wal-Mart (and perhaps Land 'N' Sea) would have had the right to make a claim under the Policy. The bankruptcy court did not have the jurisdiction or authority to impair or extinguish these independent contractual rights.[15]

---

[14] These rights were of course limited by the nature of the policy (primary versus excess) and by the specific contract. As noted, the IFCC Policy covers only those vendors who have a written contract or agreement with the Debtor indicating that the vendor is an additional insured under the Policy.

[15] *See* S.Gummow, *Bankruptcy and Insurance Law Manual,* p.166(ABI 2nd Ed.2007)(citations and quotations omitted)("while the bankruptcy court may exercise jurisdiction over (a liability insurance) policy, the interests of the co-insured, a nondebtor, are not property of the estate. To hold otherwise would allow the court to impair a third party's contract and property rights.") *See also, In re Forty-Eight Insulations, Inc.* 133 B.R.973 (N.D. Ill. 1991)(recognizing limitation on bankruptcy court's powers to impair a non-debtor, co-insured's contract rights under an insurance policy); *In re Petters Company, Inc.*, 2009 WL3316881 (Bankr. D. Minn. August 31, 2009)"Case law recognizes that any individual insured has a contractually distinct status that runs directly between itself and the insurer. This makes the right to receive payment on a covered claim the property of the insured itself. . . .").

The rights impaired include the valuable right to defense and reimbursement of defense costs. And in the case of a non-eroding policy, such as the Evanston and Axis Policies, the right to defense has the potential of being even more valuable than the right to indemnification.

Settlements, such as the one between the Debtor and the Insurers, that artificially terminate an insured's right to defense have been roundly criticized.

> The insurer's duty is both to defend actions and to pay judgments against the insured. Otherwise where damages exceed the policy coverage, the insurer could walk into court, toss the amount of the policy on the table, and blithely inform the insured that the rest was up to him. This would obviously constitute a breach of the insurer's contract to defend actions against the insured, for which premiums had been paid, and should not be tolerated by the courts.[16]

Additionally, the Settlement Injunction impermissibly dispossesses the Vendors of their rights to bring bad faith claims against the Insurers. On this point the Fifth Circuit case of *Matter of Vitek, Inc.*[17] is particularly instructive because it illustrates the balance between the practical necessity of permitting an insurer to "favor" one insured over another by settling one claim to the exclusion of another, yet preserving the rights of the "disfavored" insured. In *Vitek*, a non-settling co-insured of the debtor argued that the insurer could not favor the debtor by entering into a settlement which exhausted the policy limits. The Vendors offer the same argument here. The court in *Vitek* rejected that argument, interpreting the widely cited "principle" of insurance law that supposedly forbids an insurer from settling with one of its co-insureds to the disadvantage of another one, as recognizing "nothing more than the aggrieved insured's right to seek damages from the insurance company for making such a

---

[16] *National Casualty Co. v. Insurance Company of North America*, 230 F.Supp. 617 (N.D. Ohio 1964) (citing 8 Appleman, Ins. Law & Prac. § 4685).

[17] 51 F.3d 530, 538 (5th Cir. 1995)

settlement, by initiating a suit for breach of good faith."[18] In other words, a non-settling insured does not have the right to prevent an insurer from entering into a settlement, but the non-settling insured does have a right to bring a bad faith claim against the insurer if it believes that the settlement was improper. The Settlement Injunction denies the Vendors that right.[19] Consequently, the bankruptcy court exceeded its authority by approving the Settlement Injunction.

In sum, because the Settlements and Settlement Injunction impair significant rights of third parties – the Vendors – without compensation or their consent, the Settlements are not fair and reasonable, and the bankruptcy court did not have the jurisdiction to impose the Settlement Injunction.

## 2.    *John-Mansville* **does not support the Settlement Injunction**

As noted, the bankruptcy court relied almost exclusively on *Johns-Manville* to support its imposition of the Settlement Injunction. The *Johns-Manville* court justified its imposition of an injunction barring claims against a non-debtor party – the insurer – as a proper exercise of its equitable powers under 11 U.S.C. § 105 to facilitate the debtor's reorganization, of which the settlement was a critical part, and it found that the rights of the vendor (MacArthur) against the insurer were adequately protected because MacArthur would be permitted to assert claims against the settlement proceeds. Mansfield analogized this type of "channeling injunction" to the sale of an asset under 11 U.S.C. § 363(f), under which a court has the authority to approve a sale of bankruptcy estate assets in which third parties have an interest if

---

[18] *Id.*

[19] Axis maintains that the Axis Settlement Order does not bar the Vendors from pursuing bad faith claims against Axis and that it would consent to an order clarifying the Settlement Order on this point. Deprivation of the right to pursue bad faith claims against Axis, however, is not the only basis for overturning the Settlement Orders.

those interests can be "adequately protected" by granting them a lien on the proceeds of the sale. The *Johns-Manville* court stated that it was appropriate to extend the application of §363(f) in this way because doing so advanced the goals of a successful reorganization.

However, this is not a reorganization case. Substantially all of the Debtor's assets were sold at the end of March. And the bankruptcy court approved the Settlements with the understanding that the Debtor intended a sale of all its assets based on the plan and disclosure statement on file at the time. Thus, the primary justification cited by *Johns-Manville* for imposing the injunction on equitable grounds is absent here.

Further, *Johns-Manville* justified the propriety of the channeling injunction based on an analogy and extension of § 363(f). "It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition." The court concluded that the vendor's interests were adequately protected, and the settlement was fair because the vendor's interests were assertable against the settlement proceeds. Unlike the channeling injunction in *Johns-Manville*, though, the Settlement Injunction in this case does not permit the Vendors to pursue their claims against the settlement proceeds; the Memorandum approving the Settlement Orders (and the terms of the Evanston and Axis Orders) explicitly reserve those proceeds for personal injury claimants. Hence, the aspect of the injunction that *Johns-Manville* cited as adequately protecting the vendors' interests and thus making the settlement fair is absent here.

3.      **The Settlements are not in the best interests of the Estate**

The bankruptcy court found that the Settlements would benefit the estate. As a practical matter, however, the only constituencies that will benefit from the Settlements are the personal injury claimants and the Insurers.

15

As noted, the Memorandum setting forth the bankruptcy court's rationale for approving the Settlements specifically reserves the settlement proceeds for personal injury claimants and the Settlement Orders (as well as the Memorandum) specifically prohibit their use for administrative expenses. Consequently, the practical effect of the Settlements and concomitant release of the Insurers from their obligations to defend the Debtor is that the Debtor will have the burden of administering the settlement funds for the sole benefit of the personal injury claimants, and the costs of that administration – presumably funded with the proceeds from the recent sale of the Debtor's assets – will be borne by the rest of the creditor body. In essence, the Settlements shift the burden of administering the insurance proceeds from the Insurers to the Debtor with minimal benefit to the estate. Although the Settlements relieve the Debtor of the burden to pay any deductibles under the Policies, the benefit to the estate from that concession would be limited by the number of claims actually paid, and could potentially be limited to very few, or even one, claim exhausting the policy limits. Moreover, given the large number of unresolved claims, the costs of administering the settlement funds could easily outstrip this benefit.

The bankruptcy court also found that the Settlements benefitted the estate by providing a funding mechanism for a plan of reorganization. But the plan on file at the time indicated, and subsequent events have confirmed, that the Debtor is not going to reorganize; all of its assets have been sold. And with the restriction on the use of the proceeds the Settlements do not provide any funding for implementing a liquidating plan. They provide for a fund to be distributed to the personal injury claimants, but do not provide for any funding for the administration of that fund, other creditors, or the estate.

Thus, while the Settlements serve the laudable goal of providing a fund for a potentially orderly payment of the personal injury claims, the personal injury claimants are only one constituency, and the net effect of the Settlements is to put more burdens on the estate than they provide in benefits to the estate.

16

**4.     Procedural Infirmity**

The Settlement Injunction must also be set aside on procedural grounds. The bankruptcy court imposed the Settlement Injunction as part of the approval of Settlements between the Debtor and the Insurers in the adversary proceeding initiated by the Debtor. The Vendors, however, were also parties to the lawsuit, with pending claims against the Debtor and the Insurers. The bankruptcy court found that the Settlements and Settlement Injunction rendered the Vendors' claims moot, effectively putting an end to the adversary proceeding without a trial on the Vendors' claims.

A "settlement" between only two parties to a multi-party lawsuit is not a settlement, and the procedure to approve a compromise under Fed. R. Bankr. P. 9019(a) cannot be used to impose an injunction on the non-settling parties. The Debtor and the Insurers no more have the power to reach a settlement of the matters at issue in the adversary proceeding than the Vendors and the Insurers would if they reached a settlement depriving the estate of its bargained-for rights under the Policies.[20] The opportunity to object to a settlement does not take the place of a trial on the merits. And as litigants with pending claims, the Vendors had the right to a trial on the merits, inasmuch as Fed. R. Bank. P. 7001(7) requires an adversary proceeding for the imposition of an injunction. The Settlements and Settlement Injunction deprived the Vendors of that right.

## CONCLUSION

We understand that the Debtor, its insureds, and the personal injury claimants all have incentives to make a pot of funds available to the injury claimants in one forum, rather than having to litigate these issues around the country. However, the

---

[20] *See In re Forty-Eight Insulation, Inc.*, 149 B.R. at 865 ("[S]ettlement agreements work efficiently and effectively only when all parties with an interest in the conflict are represented in the settlement. We would no sooner approve a settlement between the insurance companies and [a non-debtor co-insured] than the one presented to us here if [the Debtor] were not a part of that settlement.").

17

"settlement" among those interests leaves the Vendors to do just that, without giving their rights of indemnification the same status as those of personal injury claimants. In a liquidation under Chapter 7, or in a plan confirmed under Chapter 11, there would be no apparent basis to treat the Vendors' unsecured, non-priority claims any differently from the unsecured, nonpriority personal injury claims. The Settlement is therefore not fair and equitable, and the bankruptcy court abused its discretion in approving it. We therefore reverse the bankruptcy court's memorandum and four orders approving settlements between the Debtor and Axis Surplus Insurance Company, Evanston Insurance Company and Interstate Fire & Casualty Company.

---